IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

DOCKET NO. 3:04-CV-321-W

| | |
|---|---|
| DARCEY R. WALRAVEN,<br><br>    Plaintiff,<br><br>  vs.<br><br>ROY COOPER, in his official capacity as Attorney General for the State of North Carolina Department of Justice, and RICHARD DAVIS, THOMAS BROWN, SKIP BRADLEY, ROBERT STROUD, JR., STATEN WILCOX, and R. STEVE BOWDEN, in their official capacities as the duly appointed MEMBERS of the NORTH CAROLINA BOARD OF CHIROPRACTIC EXAMINERS,<br><br>    Defendants. | ORDER |

THIS MATTER comes before the Court for decision on the parties' cross-motions for summary judgment (Doc. Nos. 34, 36) and Defendants' Daubert motion to exclude expert testimony (Doc. No. 38), following a motions hearing held 25 September 2006.

BACKGROUND

Plaintiff Darcey Walraven is a licensed chiropractor in the State of North Carolina with a practice in Charlotte. Dr. Walraven moved to this state from Ohio, where she was permitted, subject to Ohio Admin. Code § 4734-9-02 and certain modest regulations contained therein, to solicit patients telephonically. In order to help grow her new North Carolina practice, Dr. Walraven desires to employ telemarketing techniques to solicit the business of persons who are involved in automobile

collisions. However, North Carolina statutes and regulations impose a *per se* ban on direct personal or telephonic solicitation by a chiropractor or her "runner" (*e.g.*, professional telemarketer) within a period of 90 days following an automobile collision. N.C. Gen. Stat. § 90-401.1; 21 N.C. Admin. Code 10.0303.

Dr. Walraven filed this lawsuit against the North Carolina Board of Chiropractic Examiners (the "Board"), claiming that the North Carolina regulations constitute an unreasonable and unconstitutional restriction on commercial speech in violation of the First Amendment. As grounds for her challenge, Dr. Walraven proposes a less restrictive alternative to the North Carolina regulatory scheme – specifically, a regulatory scheme akin to the one in Ohio that would permit the kind of marketing she desires to undertake. Dr. Walraven's alternative plan would allow her to employ professional telemarketers who would be required to adhere to a prepared script. Telephone solicitations would only be initiated between the hours of 8:00 a.m and 9:00 p.m. and no person on the national "Do Not Call" registry would be called. The telemarketer would be required to identify herself and the party on whose behalf she was calling within the first 60 seconds of the telephone call. The telemarketer would then

> inform the consumer about [Dr. Walraven's] practice, and offer the consumer an opportunity to visit [her] office – without cost or obligation – to receive a consultation about the consumer's current state of health, a spinal screening exam, and the results of the screening. The consumer will be told that there is no obligation to make or accept an appointment, and a full written statement, covering everything that was discussed and offered on the telephone, will be offered to the individual upon arrival at [her] office. If the consumer is not interested in the offer, the telephone call will be terminated and, thereafter, no phone call will again be placed to that person.

(Walraven Aff. ¶ 4.) Telemarketers would be instructed not to deviate from the script, and in

particular would be instructed not to "use any threats, intimidation or profanity" and not to "require an immediate response." (Walraven Aff. ¶ 5.) If the consumer indicates interest or has any questions, Dr. Walraven will call back personally. As additional safeguards, the telemarketer would be required to maintain a list of names and telephone numbers called, record each telephone call, and maintain recordings for two years.

The Board maintains that the current regulatory scheme is a lawful restriction on commercial speech reasonably tailored to advance substantial governmental interests, including:

> 1) To eliminate over-reaching or the exercise of undue influence by health care providers;
> 2) To preserve the privacy of injured or ill persons and their immediate families;
> 3) To protect against false or misleading advertising and "bait and switch" marketing practices;
> 4) To protect against one-sided presentations that encourage speedy and uninformed decision-making concerning the availability, nature and price of health care services and the necessity of obtaining such services;
> 5) To minimize situations where the exercise of professional judgment by a health care provider is clouded by pecuniary self-interest;
> 6) To protect persons whose injury or illness makes them more vulnerable and for whom telephone solicitation would add to their level of distress; and
> 7) To maintain standards among members of licensed health care professionals.

(Mem. in Supp. of Def's Mot. for Summ. J. at 5-6.)

STANDARDS OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c). Here, both parties have moved for summary judgment and agree that summary judgment is appropriate on the present record.

The First Amendment protects commercial speech from unwarranted governmental regulation. In <u>Central Hudson Gas & Electric Corp. v. Public Service Commission of New York</u>, 447 U.S. 557 (1980), the Supreme Court set forth a four-part analysis to follow in commercial speech cases:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than necessary to serve that interest.

<u>Id.</u> at 566. The burden of persuasion is on the Board as the regulatory body seeking to uphold the restriction on commercial speech. <u>Bolger v. Youngs Drug Products Corp.</u>, 463 U.S. 60, 71 n.20 (1983).

## ANALYSIS

Here there is no serious dispute that either (1) non-deceptive advertising of chiropractic services is protected speech under the First Amendment or (2) North Carolina has several legitimate and substantial governmental interests in regulating solicitation concerning chiropractic services. <u>Accord</u> <u>Bailey v. Morales</u>, 190 F.3d 320, 323 (5th Cir. 1999).

To satisfy the third prong of <u>Central Hudson</u>, the Board must demonstrate that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." <u>Edenfield v. Fane</u>, 507 U.S. 761, 771 (1993). As Dr. Walraven argues, the regulations here at issue may not

4

Case 3:04-cv-00321-FDW-DCK   Document 48   Filed 02/27/07   Page 4 of 9

directly and materially advance some of the governmental interests that the Board asserts. For example, it is widely recognized that an "advertising ban does not directly affect professional standards one way or the other," Virginia State Board of Pharmacy v. Virginia Citizens Consumer Counsel, Inc., 425 U.S. 740, 769 (1976), and that restraints on advertising are "an ineffective way of deterring shoddy work," Bates v. State Bar of Arizona, 433 U.S. 350, 378 (1977). Nevertheless, Central Hudson may be satisfied by reference to but one substantial interest advanced by the regulations. See Florida Bar v. Went For It, Inc., 515 U.S. 618, 624 n.1 (1995). And clearly, the challenged regulations do directly and materially advance at least one substantial governmental interest – that is, the protection of a particular segment of the public from invasive (and potentially coercive and/or misleading) solicitation tactics under circumstances in which they may be particularly vulnerable. Accord Florida Bar, 515 U.S. at 625-28; National Funeral Services, Inc. v. Rockefeller, 870 F.2d 136, 143-44 (4th Cir. 1989). As this Court previously found in its Order on Plaintiff's motion for preliminary injunction (Doc. No. 17):

> The [Board] proffered evidence in the form of affidavits, exhibits and testimony, which illustrates the type of harassment personal injury victims were often subject to in the days following an injury, prior to the enactment of the various statutes in question. The evidence offered by the [Board] also show that victims of personal injury are often in a heightened state of vulnerability and distress in the days following an injury, and that the statutes in question have provided some form of relief from in-person and telephone coercion by chiropractors or runners.

Dr. Walraven has made no effort to refute the Board's evidence and arguments as to this point. Rather, she argues that the challenged regulations are more broad than necessary to promote the claimed interests. This argument, however, is more properly considered in the fourth prong of the Central Hudson analysis. Accordingly, the Board has satisfied its burden at stage three.

5

To satisfy the fourth prong of Central Hudson, the Board must demonstrate the existence of a reasonable "fit between the legislature's ends and the means chosen to accomplish those ends." The required fit is "not necessarily the single best disposition but one whose scope is in proportion to the interest served;" it "employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." Florida Bar, 515 U.S. at 632. "A regulation need not be absolutely the least severe that will achieve the desired end, but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the fit between ends and means is reasonable." City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417 n.13 (1993).

Thus, the fact that Dr. Walraven has proposed a seemingly viable alternative regulatory scheme – even one that has found favor in other jurisdictions – is not alone sufficient to invalidate the North Carolina regulations. Different states have differing political priorities that may warrant varying degrees of regulation, and the First Amendment should be construed to allow states some latitude in the self-determination of both their legislative objectives and the appropriate means to accomplish those objectives. Therefore, the Court must undertake a careful balancing that considers both the breadth of speech regulated and the efficacy of the regulatory framework in relation to the legitimate governmental interests sought to be advanced.

The first relevant inquiry therefore is whether the challenged regulations are overly broad, such that they restrict more speech than is necessary to accomplish the state's objectives. Dr. Walraven argues that, as a practical consequence of the facts that chiropractic therapy should be administered immediately after injury and targeted telemarketing is the most effective method of advertising, a 90-day ban on telephonic solicitation is in effect a blanket ban, which courts routinely

6

disfavor. See, e.g., Capobianco v. Summers, 377 F.3d 559, 563 (6th Cir. 2004). This conclusion, however, is wholly dependent on the level of abstraction from which the issue is viewed. While the Court agrees that the challenged regulations significantly burden Dr. Walraven's ability to advertise by effectively precluding all telephonic contact with the class of persons who would be most receptive to a personal invitation to see a chiropractor, this is a far cry from a "blanket ban" on Dr. Walraven's commercial speech. Dr. Walraven retains the ability to reach prospective car accident clients by means of the mass media and even targeted mailings, and she may solicit potential clients in-person or by telephone so long as she does not target them on account of their status as recent car accident victims. By singling out for regulation only speech which is particularly susceptible to fraud and overreaching (*i.e.*, in-person and telephonic solicitation) and which is targeted at a "protected class" of particularly vulnerable consumers (*i.e.*, recent victims of car accidents), the North Carolina regulations are easily distinguished from the laws of other jurisdictions which have been struck down as overly broad in the cases cited by Dr. Walraven.

The second relevant inquiry is whether Dr. Walraven's less-restrictive alternative would be as feasible and effective as the current law, in terms of achieving the state's legislative objectives without substantially increasing the burden on state enforcement authorities in securing compliance. Dr. Walraven argues that any threat of overreaching would be obviated by the proposed script from which her contracted telemarketers would be instructed not to deviate. As many courts have noted, however, the content of a telephonic solicitation is inherently more difficult to regulate than the content of a written solicitation – a distinguishing feature that may justify a prophylactic ban of the former but not the latter. Shapero v. Kentucky Bar Association, 486 U.S. 466, 476 (1988); National Funeral Services, 870 F.2d at 144; Gregory v. Louisiana Board of Chiropractic Examiners, 608 So.2d

987 (La. 1992). Written solicitations are capable of being screened for compliance by a state regulatory authority before they are ever mailed. By contrast, telephonic solicitations (even scripted ones) do not take place in a controlled environment and improper deviations from the script are not susceptible to detection until after the harm is done (provided that a disgruntled consumer even bothers to report the violation to the relevant authorities), and then the only recourse in the event of a violation likely would be against a party (the "runner" or telemarketer) not necessarily subject to the Board's disciplinary jurisdiction. Furthermore, even assuming that Dr. Walraven's alternative would be effective at ensuring the truthful and tactful content of the solicitation, her proposal does not address the concerns that the Board has advanced for protecting the privacy of car accident victims from a barrage of invasive and subtly coercive telephone calls in the immediate wake of experiencing a traumatic life event.[1]

While Dr. Walraven argues that the modern "trend" of the Supreme Court has been toward applying a strict scrutiny (least restrictive alternative) test for the regulation of commercial speech, such a "trend" has yet to take root in a precedential decision that would bind this Court to take the extreme measure of invalidating the North Carolina regulations here at issue. Based on the foregoing considerations and its interpretation of existing law, the Court concludes that the Board has satisfied its burden under Central Hudson.

## CONCLUSION

For the reasons stated, Plaintiff's motion for summary judgment (Doc. No. 34) is DENIED, Defendants' motion for summary judgment (Doc. No. 36) is GRANTED, and Defendants' Daubert

---

[1] The Court rejects Dr. Walraven's argument that the pursuit of this state interest has been preempted by the passage of the Telemarketing and Consumer Fraud and Abuse Prevention Act and the institution of the national "Do Not Call" registry as wholly without merit.

motion (Doc. No. 38) is DENIED as moot. The Clerk is directed to CLOSE this case.

IT IS SO ORDERED.

Signed: February 27, 2007

*Frank D. Whitney*
Frank D. Whitney
United States District Judge

9